# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

RICHARD REDMAN,

                    Plaintiff,

v.                                                    Case No. 17-CV-239-JPS

LORI DOEHLING and CHRISTINE
DIETRICH,                                             **ORDER**

                    Defendants.

---

Plaintiff Richard Redman ("Redman"), a prisoner, brings this action pursuant to 42 U.S.C. § 1983 against Defendants, prison officials at Redgranite Correctional Institution ("Redgranite"), arising from Redman's medical care related to his right foot. Redman makes constitutional and state-law claims related to Defendants' alleged mistreatment. Defendants each filed a motion for summary judgment as to all of Redman's claims. (Docket #27 and #34). The motions are fully briefed and, for the reasons stated below, they will be granted.[1]

## 1.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] Along with his response to Defendants' motions, Redman filed his fourth motion requesting the appointment of counsel. (Docket #44). The motion will be denied as moot; since the case will be dismissed, there is no need for Redman to have appointed counsel. Moreover, the motion provides no new or persuasive evidence regarding Redman's need for counsel. The Court provided a detailed explanation in three prior orders as to why the reasons Redman gives for desiring counsel are not sufficient. (Docket #6, #19, #22). It need not do so a fourth time.

matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). The party opposing summary judgment "need not match the movant witness for witness, nor persuade the court that [his] case is convincing, [he] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

## 2.     RELEVANT FACTS[2]

Redman is an inmate at Redgranite. Defendant Christine Dietrich ("Dietrich") was an advanced practice nurse prescriber employed by

---

[2]Redman's evidentiary submissions are scattered, and he often asserts disputes to Defendants' proffered facts without a precise record citation, or with no citation at all. *See, e.g.*, (Docket #51 ¶ 13). Where it was feasible, out of appreciation for Redman's *pro se* status, the Court attempted to locate the relevant evidence. Otherwise, the Court ignored unsupported facts or disputes. *See Hill v. Thalacker*, 210 F. App'x 513, 515 (7th Cir. 2006); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

It should also be noted that Dietrich attempted to offer additional proposed material facts in connection with her reply in support of her motion. (Docket #54 at 38–39). The Court disregarded these, as they are not authorized by the local or federal rules governing summary judgment practice. More to the point, Redman was not afforded any opportunity to contest them.

Maxim Healthcare Services, Inc., a private company that contracted with the Wisconsin Department of Corrections to provide health care services to inmates at Redgranite. While working at Redgranite as a nurse practitioner, Dietrich signed off on scheduled appointments but did not have any control over actually scheduling them or locating a particular provider to which an inmate might be sent. That was the job of the medical program associate assistant ("MPAA"), who maintains inmate medical records, schedules all off-site medical appointments, and coordinates the necessary transportation and communication of medical records to outside providers.

Defendant Lori Doehling ("Doehling") is the health services manager at the institution. The health services manager provides the overall administrative support and direction of the health services unit. The primary care clinicians, and not the health services manager, are responsible for the professional management of medical services to the inmates.[3]

Inmates at Redgranite are provided one state-issued pair of shoes. Inmates are free to purchase additional pairs of shoes, up to a maximum of three. The health services clinicians may order the institution to purchase special shoes for inmates with medical restrictions related to their feet.

---

[3]Doehling says that she did not provide any direct health care to Redman, nor did she make any treatment decisions related to his health care. (Docket #51 ¶ 4). Redman strenuously objects to the idea that Doehling was not involved in making treatment decisions for him. *See id.* ¶¶ 4, 37, 42. This dispute pervades the case and will be discussed further below. For the present, it suffices to observe that Redman has offered no actual evidence—in the form of a prison policy or some testimony within a witness' personal knowledge—that contradicts the general proposition that clinicians, and not health services managers, make the final treatment decisions for inmates.

Redman's clinicians at Redgranite provided him with orthotic inserts for his shoes since at least 2014. Health services clinicians also ordered the institution to purchase shoes for Redman since at least 2014. In 2014, the institution purchased Redman a pair of black velcro shoes, as well as a pair of brown oxfords.

On February 26, 2015, Dr. Fern Springs ("Springs"), a clinician at Redgranite, requested prior authorization for non-urgent care to address Redman's bilateral bunions which were continuing to grow to the point where extra wide/extra depth shoes were insufficient. A podiatry consultation was approved. Redman was scheduled for an appointment at the University of Wisconsin Hospital and Clinics Podiatry Department ("UW Podiatry").

On April 2, 2015, Redman saw Dr. Jill Migon ("Migon") at UW Podiatry. Migon took x-rays and diagnosed Redman with (1) right foot hallux rigidus—arthritis in Redman's right foot's first metatarsophalangeal joint ("MPJ")—and (2) left foot hallux abducto valgus deformity—a bunion. Migon recommended surgery to fix the condition in Redman's right foot. Migon further recommended that the institution allow Redman to purchase personal shoes from an outside vendor with removable insoles, wide width, and high tops.

Dr. Springs reviewed Migon's recommendations. Springs entered a prescriber's order to allow Redman to select New Balance shoes from the approved catalog. Nurse Bellin ("Bellin") initialed the entry and sent a patient communication form to instruct Redman to purchase New Balance shoes from the approved catalog.

On May 9, 2015, Redman submitted a two-page health services request to Doehling's attention asking to meet and discuss his shoe order.

Nurses generally answer health services requests and do not always route them to the health services manager, even if they are addressed specifically to Doehling. In this case, Bellin responded to Redman that the prison's property division was handling the shoe matter and advised him to contact them. On May 11, Redman sent another health services request to Doehling regarding Bellin's note. Doehling responded this time, stating that Redman was able to self-purchase New Balance brand shoes from one of the approved inmate catalogs.

June 5, 2015 was Redman's first appointment with Dietrich related to his foot issues. On that date, she met with Redman to clear him for the upcoming surgery for right first MPJ arthrodesis with screw and pin fixation. On June 17, Migon performed the surgery. Post-surgery orders were written for Redman that same day, and Dietrich signed them that day. The orders included Vicodin, periodic icing, extra pillows to elevate the right foot, that Redman keep the dressing dry and intact until his follow-up appointment, and that Redman be non-weightbearing with crutches.

Redman was also prescribed specific medical restrictions. Bellin completed a medical restrictions form for Redman, which included, among other restrictions, a wheel chair for one month, a low bunk on the first floor of the institution, crutches, an ace wrap, two extra pillows, spectator-only status at recreation, and a cold bag to use for twenty minutes every hour for ten days. Bellin also instructed Redman not to put any weight on his right foot until further notice.

Redman had a follow-up appointment at UW Podiatry on June 19, 2015. Migon instructed him to continue with the ice and elevation. She also applied a non-weightbearing cast. At Redman's next appointment on June 26, Migon removed Redman's stitches and then reapplied the cast. She

recommended that Redman continue to be non-weightbearing, continue elevation of his foot, and take Tylenol for pain as needed. Dietrich signed Migon's June 26 orders on June 30, 2015.

Migon also ordered a follow-up to occur in one month—sometime in late July—to take x-rays. (Docket #46 ¶ 6); (Docket #51 ¶¶ 19–20). If the x-rays showed sufficient improvement, Dr. Migon planned to remove the cast and implement a removable hard boot. (Docket #51 ¶¶ 19–20). However, the appointment did not occur in July.[4]

On July 1, 2015, Dietrich entered a request for MPAA to schedule Redman for his next appointment with UW Podiatry. The MPAA arranged for Redman to return to UW Podiatry on September 11, 2015. On August 25, Redman submitted a health services request asking for information on when his cast would be removed, indicating that the podiatrist told him he would be casted for six to eight weeks after surgery, and stating that the next day marked ten weeks since his surgery. (The actual time elapsed since the cast was applied on June 26 was two months.) A nurse responded the next day and informed Redman that he would return to UW Podiatry on September 11.

However, on August 27, UW Podiatry contacted the MPAA to reschedule Redman's appointment to October 9, 2015. Initially, it appears that the institution's remedy was to schedule him for cast removal at the prison. Later, on September 2, after a nurse spoke to Dietrich about the cast removal, the staff determined that they did not have the right equipment.

---

[4]At this juncture in the factual briefing, Redman lodges a lengthy complaint about what he sees as discovery misconduct by prison officials and their counsel. (Docket #54 ¶ 19). Whatever may have been his difficulties in obtaining review of his medical records, he never presented a meritorious motion to compel, *see* (Docket #19), and a few angry remarks in a statement of facts is no substitute.

Dietrich therefore entered an order for Redman to be scheduled for an appointment at CHN Orthopedic & Sports Medicine-West ("CHN"), a local clinic in Berlin, Wisconsin, for his cast removal. The MPAA was able to schedule an appointment for Redman to go to CHN on September 3.

Dr. David Jones ("Jones") at CHN removed Redman's cast, applied an Aircast boot, and recommended that Redman follow up with Dr. Migon. Dietrich entered an order on that recommendation the next day. On September 22, 2015, Doehling met with Redman to discuss his request for high top athletic shoes due to his Achilles tendon repair in 2000. Doehling told Redman his request would be approved for size 11.5 3E width modified high top Nike shoes. The shoes were ordered for Redman that day.

Redman returned to UW Podiatry on October 9, 2015. Migon noted that Redman had the cast removed and was given an Aircast boot. She further noted that he had been "lost to follow up" and was told by Dietrich and Doehling that this was due to difficulties in transporting him to Madison. (Docket #39-1 at 6). Migon wrote that Redman was doing quite well but had some diminished bone stock.

Redman reported he was ambulating well around his cell since the cast was removed with no swelling, pain, or other complaints. Redman's x-rays showed a stable arthrodesis site with two crossing screws and a one-third tubular plate. There were signs of spongy bone crossing the fusion site, but it was not completely fused. Redman was given a surgical shoe with a stiff bottom to wear at all times to minimize stress on the joint, but also to allow him to ambulate in order to increase some bone generation. Migon instructed Redman to minimize his physical activity for the present,

but to gradually resume it. Migon cautioned him not to jump, play basketball, run, or do anything to stress the joint.

Orders were written after Redman's visit with Dr. Migon on October 9, 2015, and Dietrich signed the orders on October 13, 2015. The October 9 orders included that Redman could be fully weightbearing, with a blue post-operative velcro shoe, and that he should return to the clinic in three to four weeks, at which time he would return to regular shoes.

On October 12, Redman submitted a request for replacement oxford shoes. Redman apparently believed that he was required to wear oxfords or state-issued boots for off-site transfers. He also stated that "winter was on its way and [he] wanted to be safe in hard shoes[,] not tennis shoes." (Docket #51 ¶ 29). However, inmates with medically approved footwear are allowed to wear the medical approved shoes off-site. As Doehling explains, the medically approved shoes in effect "become the 'state-issued' shoes, and are therefore acceptable to wear during off-site transfers." (Docket #30 ¶ 34). Because health services purchased the special modified high top athletic shoes for Redman in September, the institution was not obligated to purchase Redman an additional pair of shoes. Redman was free to purchase additional shoes from an outside vendor or the approved inmate catalog.[5]

---

[5] Redman does not dispute that he could have bought his own shoes, but he claims that the institution was required to do so. He cites a prison healthcare policy, designated HSU 300.07, which pertains to the provision of shoes. (Docket #51 ¶ 30); (Docket #31-1). However, his only support for his reading of the policy are his own letters to Doehling arguing that the policy required her to order him another pair of shoes. *See* (Docket #51 ¶ 30). The policy itself requires no such thing; it simply says that a prison must provide an alternative pair of shoes if a medical condition makes it impossible for an inmate to wear a standard-issue pair. *See* (Docket #31-1 at 8). Indeed, once a proper pair has been provisioned, the policy

Redman returned to UW Podiatry for another follow-up on November 20, 2015. Migon noted that Redman had been in the surgical shoe for six weeks. Redman had not resumed any physical activity, but he told Migon that he walked around barefoot in his cell on occasion. Redman said he felt he had regained a lot of strength in his legs and had no concerns or complaints, and essentially no pain. Redman had x-rays taken at the November 20 appointment, which appeared improved since the October 9 appointment. However, Migon noted the fusion was still not complete and recommended continuing with weight-bearing only in the surgical shoe and no physical activity except for upper body weights and a recumbent bicycle. Migon emphasized the importance of wearing the surgical shoe at all times to prevent hardware failure due to joint motion. She wrote in her note that Redman should continue with the current plan of weightbearing in the surgical shoe and follow up with her in about one month.

Dietrich filled out the form to schedule Redman's next follow-up, which was set for December 18, 2015. On December 4, Dietrich also prescribed pain medication for Redman. At the December 18 appointment with Migon, she noted that there was no apparent fusion crossing the MPJ space. She recommended a bone stimulator and a protein drink at lunch and dinner. Migon also recommended lifting the weight room and recreation restrictions, with no squats or strenuous activity to the joint, and permitting regular shoes to be worn for those activities. Migon instructed Redman to continue to wear the surgical shoe at all other times.

mandates that "HSU will not get involved with ordering extra pairs of personal shoes." *Id.* Redman cannot bootstrap his own reading of the policy into evidence.

Orders were written after this visit, and Dietrich signed the orders the same day. The orders included that Redman continue with the surgical shoe at all times, except when in the weight room; that a bone stimulator was recommended to increase healing; to supplement lunch and dinner with one protein drink; and that Redman return to clinic in one month.

On December 21, 2015, Doehling sent an email to Dr. Ryan Holzmacher ("Holzmacher"), who at that time was the medical director of the Wisconsin Department of Corrections, attaching the recommendations made by Dr. Migon on December 18 and offering her views on them. (Docket #49 at 16–17). Dietrich was copied on the email. Doehling disagreed with some of the recommendations as raising a likelihood of re-injury, such as allowing regular shoes in the gym. *Id.* at 17. She also noted that bone stimulators were in short supply and that Redman was not eligible for a protein shake regimen because he was overweight. *Id.* Finally, she observed that Redman had been seen once per month since June 2015, which was the most frequent series of follow-ups she had seen for any clinic. *Id.*

Dr. Holzmacher reviewed Doehling's email and Dr. Migon's recommendations. *Id.* at 15. He instructed her to "disregard all these orders as they make no sense." *Id.* He asked Doehling to schedule Redman to see another physician for a second opinion. *Id.* Doehling thereafter wrote an order indicating that Dr. Migon's December 18 recommendations were not approved by Dr. Holzmacher.

Also on December 21, 2015, Redman submitted a health services request asking why the recommendations from Dr. Migon for protein drinks and the bone stimulator were denied. A prison nurse referred the request to Doehling, who responded on December 22, indicating that he would be scheduled with a local podiatrist as the Department of

Corrections was not sending inmates to UW Podiatry as frequently. On that date, Dietrich filled out the off-site service request form for the MPAA to schedule Redman for an appointment with Dr. Thomas Grossman ("Grossman") at Waupun Memorial Hospital for a second opinion.

On January 11, 2016, Redman saw Dr. Grossman. Redman had right foot x-rays completed and the radiologist noted the MPJ space was still visible, with no evidence of hardware loosening. Grossman agreed with Migon's recommendations from December 18 for a bone stimulator and protein drink regimen. Dietrich entered orders implementing Grossman's recommendations two days later, on January 13, 2016.

Doehling then spoke with Dr. Grossman on January 20 about Redman's activity restrictions. Doehling says she witnessed Redman playing basketball after Dr. Migon lifted his weight and activity restrictions in mid-December 2015, despite being told not to engage in activity that would stress the joint. Redman counters that he was only standing still shooting free-throws and was not putting strain on his leg. (Docket #51 ¶ 43).[6] Grossman recommended that Redman should not participate in basketball or other contact sports and that he should refrain from lower body weight lifting until his foot was fully healed.

On January 20, 2016, Dietrich submitted an authorization form for Redman, requesting a bone stimulator and protein drinks twice daily. Holzmacher approved these items that same day. The treatment records show that Redman began receiving protein drinks on January 20 and the bone stimulator treatment on January 23. Redman used the bone stimulator

---

[6]Redman says that the video surveillance footage should show that he is correct in his description of his activity. (Docket #51 ¶ 43). He did not supply it to the Court.

from January 23 until March 18, 2016. On January 29, Redman was approved to receive extra-wide shoes to replace his oxfords. Redman received the shoes on February 2.

On a March 18 order from Dietrich, Grossman next saw Redman at on April 11, 2016, after completing eight weeks of bone stimulator treatment and protein-drink regimen. Grossman detected some motion in the joint. Redman's x-rays showed a persistent joint line, a broken proximal screw and loosened cross-joint screws. Grossman diagnosed Redman with a failure of the arthrodesis and recommended returning to Dr. Migon for further care.

Redman returned to UW Podiatry on May 20, 2016 on Dietrich's order of April 15. This was Dietrich's last day on assignment at Redgranite, and her last interaction with Redman as relevant to this case. At the May 20 appointment, Migon recommended revision surgery. Redman was approved for the surgery on June 9. On June 16, advanced practice nurse prescriber Kristen Lachapell ("Lachapell") filled out the off-site service request form for the MPAA to schedule Redman for the surgery. Redman's surgery was scheduled for June 29, 2016.

Redman had the revision surgery as scheduled. Migon recommended that Redman take two protein supplements daily beginning immediately, but not to begin use the bone stimulator until after his first post-operative appointment. Redman began taking protein supplements on June 29. At Redman's first post-operative follow-up appointment on July 6, 2016, the physician recommended the commencement of the bone stimulator, the continued use of the protein drink, to remain non-weight bearing, and to have post-operative x-rays taken. On July 15, Redman returned to UW Podiatry for another follow-up. Migon removed his

stitches and continued his current recommendations. Redman began using the bone stimulator in July and continued using it until September 15, 2016.

On August 20, Redman submitted a health services request asking for an extension of his protein drinks because they were scheduled to end on September 21. Nurse Barter ("Barter") responded on September 20 that the request would be forwarded to his prescriber clinician. Redman wrote again on August 21, again asking for someone to authorize the continuance of his protein shakes. Barter responded the next day, noting that the request was already sent to the prescriber. Another prison physician, Dr. Mary Sauvey, discontinued Redman's protein drink regimen on August 22, 2016. However, Redman continued to receive a protein drink twice daily through August 23. On August 24, Redman submitted another health services request asking why his protein drinks had been stopped. One of the nurses responded that the doctor discontinued the order.

Redman had another follow-up appointment with Migon on August 26, 2016. Migon approved Redman to participate in outdoor recreation and weights (upper body only), and said he could begin walking, but that he must wear a protective boot while ambulating. She also recommended continuing with the bone stimulator and a protein shake each day for one month until his next follow-up appointment. Redman's protein shakes were restarted on August 28. Redman continued to receive them until September 30.

Redman had another post-operative follow-up appointment with Migon on September 23. Redman's x-rays showed bony bridging at the fusion site with diminishing signs of the graft. Redman was approved to return to the weight room without restrictions, including wearing athletic

shoes. Migon instructed him to continue wearing the post-operative shoe out of the weight room.

On November 2, 2016, Redman had his final post-operative appointment. The physician had Redman cast for custom orthotics and approved him to return to normal athletic activity. The doctor noted he should wear an extra-wide, high top athletic shoe, obtained from an outside vendor. Lachapell clarified the note about the shoes on November 9 to indicate that the prison would issue Redman one pair of extra-wide width athletic modified high top shoes—to allow for the custom orthotics—per year. These were provided to Redman on November 5.

As of March 3, 2017, Redman was cleared for physical activity on all levels. As of that date, he participated on the intramural basketball team, able to run multiple lengths of the court, pass, shoot, defend, and dribble without impairment. Redman exhibited vigorous participation and was able to keep up a high energy level for more than twenty minutes utilizing the full court. During this activity, Redman did not show any non-verbal signs of pain and did not take breaks to rest.

3.    **ANALYSIS**

This case is largely about Redman's belief that Dietrich and Doehling meddle in inmates' medical care. According to him, these two individuals have their own views of how to care for inmates, and they routinely implement those views over the orders of physicians. Redman's theory is that their interference contradicted Dr. Migon's orders and thereby caused painful and debilitating delays in proper treatment for his foot.

To establish that Defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, Redman must show: (1) an objectively serious medical condition; (2) that Defendants

knew of the condition and were deliberately indifferent in treating it; and (3) this indifference caused him some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The deliberate indifference inquiry has two components. "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 843 (1994)). Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

To prove deliberate indifference, a plaintiff must come forward with evidence showing more than ordinary or even gross negligence. *McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir. 1991); *Hughes v. Joliet Corr. Ctr.*, 931 F.2d 425, 428 (7th Cir. 1991). Indeed, he must demonstrate that the medical professional's treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996). It is "obduracy and wantonness, not inadvertence or error in good faith, that characterize[s] the conduct prohibited by the [Eighth Amendment]." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The question is not whether the plaintiff believes some other course of treatment would have been better. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996); *Reynolds v. Barnes*, 84 F. App'x 672, 674 (7th Cir. 2003) ("[T]he Constitution does not mandate that a prisoner receive exactly the medical treatment he desires."). If the inmate has received some health care, it then

falls to him to show that the treatment he received was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his medical condition. *Snipes*, 95 F.3d at 592. Mere disagreement with a professional's medical judgment is insufficient. *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007). Put differently, the plaintiff must show that his medical providers made treatment decisions "'so dangerous' that the deliberate nature of [their] conduct can be inferred." *Gayton*, 593 F.3d at 623 (quoting *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999)). Courts generally defer to physicians' treatment decisions, since "there is not one proper way to practice medicine, but rather a range of acceptable courses." *Jackson v. Kotter*, 541 F.3d 688, 697–98 (7th Cir. 2008). A court must "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999).

Redman's claim has several facets. Whether considered individually or as a connected whole, they do not amount to deliberate indifference. First, Redman contends that Defendants violated prison policy by failing to fill out the proper forms required to order a cast removal, schedule appointments, or lodge their disagreement with Migon's treatment recommendations, including the bone stimulator and protein shakes. (Docket #54 ¶ 9, 17); (Docket #46 ¶¶ 25–26); (Docket #45 at 5–6). Yet deliberate indifference does not arise from a violation of prison policy standing alone. *Lewis v. Richards*, 107 F.3d 549, 553 n.5 (7th Cir. 1997); *Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996). Redman must do more than line up Defendants' conduct against the healthcare handbook.

Second, Redman accuses Doehling and Dietrich of doctoring his medical records. *See* (Docket #46 ¶¶ 18, 21–23, 29, 36); (Docket #45 at 4). His

claims are not corroborated by the record, and Redman's speculation does not carry his burden to show that material issues remain for trial regarding allegedly falsified records. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008); *Lindwurm v. Wexford Health Servs., Inc.*, 84 F. App'x 46, 48 (10th Cir. 2003). At worst, Redman has discovered a few records which appear out of chronological sequence. In a medical record as lengthy as his, the Court is not at all surprised by this. While the Court must draw reasonable inferences in Redman's favor at this stage, it is not reasonable to infer, as Redman does, that small discrepancies in the record betray some concerted campaign of fraud and misdirection. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("[W]e are not required to draw every conceivable inference from the record. Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.") (internal quotation and citations omitted).

Relatedly, Redman accuses Defendants of having ever-shifting stories about their decisions, undermining their credibility. *See* (Docket #54 ¶¶ 22, 93). He seems to believe that Defendants were required to send him to Dr. Migon only, and not Dr. Jones, Dr. Grossman, or any other provider. When they did so, says Redman, they manufactured objections about the difficulty in transporting inmates to Madison and problems with Migon's treatment orders. Redman believes that in reality, the decision to use CHN for cast removal and Dr. Grossman for a second opinion were, among others, part of a scheme to purposefully deny Redman his needed care.

These accusations are, at their core, that Defendants used easier and less effective treatment in disregard of Redman's medical needs. But even if the Court went along with Redman's theory that Defendants changed their story as events progressed, he lacks evidence that any resulting

treatment decisions were constitutionally inadequate. This is the crucial point Redman seems to have missed throughout. Defendants are not required under the Constitution to be perfect healthcare providers, nor provide the care Redman thinks he needs; they are merely obliged to provide prisoners with constitutionally adequate healthcare. *Reynolds*, 84 F. App'x at 674. Redman has not shown that Defendants, influenced by some animus against him or a tight rein on expenditures, provided "easier and less efficacious treatment" without exercising professional judgment. *Estelle*, 429 U.S. at 104 n.10; *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

Indeed, even assuming that Defendants falsified records, lied to him, or had less-than-persuasive reasons for their actions, Redman fails to demonstrate that his treatment was constitutionally inadequate, which at bottom, remains the critical question here. *Rega v. Beard*, Civil Action No. 08–156, 2011 WL 7094571, at *6 (W.D. Pa. Dec. 13, 2011) ("[M]erely lying to a patient does not constitute deliberate indifference."); *Hines v. Smith*, No. 04 Civ. 5903(PAC), 2006 WL 2038454, at *8 (S.D.N.Y. July 17, 2006) (a prisoner must show both that defendant lied to prevent him from receiving care, and also that the care was objectively necessary). In other words, Redman's claim is not for lying, which is generally not a Constitutional violation anyway. His claim is for deliberate indifference to his medical needs, and the record indisputably establishes that he was provided extensive, appropriate medical care. In the end, Redman simply disagrees with his medical providers as to the proper course of treatment. Without belaboring the point, this does not constitute a proper basis for a constitutional claim.

Next, Redman asserts that his recovery was hampered after Defendants forgot to schedule his cast removal in July 2015. *See* (Docket #46 ¶ 30). Defendants counter that scheduling difficulties stood in their way. They also suggest that they had nothing to do with scheduling appointments; such was the work of the MPAA, not the higher-level nursing staff. Yet even taking Redman's version of events as the correct one, forgetting to schedule an appointment is not deliberate indifference. It is negligence, something the Constitution does not remedy. *Estelle*, 429 U.S. at 105–06.

Redman also complains of Doehling's decision to deny him his request for new oxfords, in what appears to be a separate grievance unrelated to his surgical recovery. (Docket #45 at 1–2) (noting that Redman has had a "shoe battle" with Doehling stretching back for years prior to his foot surgery). Whether prison policy entitled him to another pair of oxford shoes, he does not explain why the denial thereof caused him injury. Violation of the policy is, again, not enough to make out a claim. *Langston*, 100 F.3d at 1238. Further, even if the Court needed to reach the parties' conflicting readings of the policy, Redman's is not colorable. The policy plainly provides inmates with one pair of state-issued shoes, and Redman was not entitled to one pair of each type that he might desire.

Then there is the centerpiece of Redman's case: the December 21, 2015 email chain with Dr. Holzmacher. Redman says that Defendants decided they knew better than Dr. Migon and appealed to Holzmacher to agree with them. To Redman, Holzmacher's response instructing them to disregard Migon's recommendations was not his decision. He simply signed on to the nurses' position at their urging. *See* (Docket #46 ¶¶ 19, 33–35); (Docket #54 ¶ 56); (Docket #45 at 21).

Assuming that the delay in receiving the bone stimulator and protein shakes hindered Redman's recovery, he nevertheless falls short of presenting evidence from which a reasonable jury could find deliberate indifference. Beyond bare conjecture, Redman does not rebut the indication in the record that it was Holzmacher, and not Defendants, who made the final determination to disregard Migon's orders. His treatment providers are not guilty of deliberate indifference for having failed to abide by his desires, and he has proffered no facts showing that Holzmacher's decision was "so inadequate that [it] demonstrated an absence of professional judgment, that is, that no minimally competent professional would have [done the same] under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998).

It matters not that Holzmacher considered the recommendations of institution staff before reaching his conclusions; medical providers cannot be prohibited from consulting with each other regarding an inmate's care. This is particularly true when Holzmacher is called upon to make a decision about an inmate with whom he has little or no personal interaction. There is nothing to substantiate the claim that Defendants unduly influenced him, or that their suggestions caused him to make a decision that was not based on his own medical judgment. *See Johnson*, 433 F.3d at 1013.

Nor is it problematic that Holzmacher disagreed with Migon, as he was entitled to make his own determination of the medically appropriate course of treatment. *See Zackery v. Mesrobian*, 299 F. App'x 598, 601 (7th Cir. 2008) ("[A] difference of opinion among physicians is insufficient to establish deliberate indifference."); *Askew v. Davis*, 613 F. App'x 544, 547 (7th Cir. 2015). Holzmacher had reasons to view Migon's recommendations as internally inconsistent and overreaching, and so he sought a second

opinion from Dr. Grossman. Redman's complaint runs headlong into the principle that "[t]here is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson*, 541 F.3d at 697.

A prison doctor is not remiss simply for seeking a second opinion. That decision falls in line with the long-standing principle that conservative treatments are not indicative of deliberate indifference on their own. *See Holloway v. Del. County Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012); *Norfleet v. Webster*, 439 F.3d 392, 396–97 (7th Cir. 2006). Instead, a treatment delay must gratuitously exacerbate the injury or cause needless pain. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). That did not happen here. The institution staff acted on Grossman's recommendations even though they mirrored Dr. Migon's, thereby suggesting that it was not some animus against Redman that motivated their seeking out Grossman's thoughts. In other words, while Defendants would have been wrong if they ignored the identical recommendations of two doctors, that did not occur. *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (a prison official's decision to "persis[t] in a course of treatment known to be ineffective" may support a finding of deliberate indifference). The Court cannot see where Holzmacher acted with deliberate indifference to Redman's medical needs—and this all assumes, of course, that Dietrich and Doehling could be held responsible for those decisions. *See J.H. ex rel. Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) ("In order to recover damages against a state actor under § 1983, a plaintiff must show the actor was personally responsible for the constitutional deprivation.").

Finally, Redman challenges the delay of a few days between Grossman's recommendations in January 2016 and their implementation.

*See* (Docket #45 at 15–17); (Docket #54 ¶ 56). Such minor delays are commonplace both inside and outside of prisons, and Redman gives no reason why those few days evidence deliberate indifference. As in *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997), "at most [Redman] experienced an isolated occasion or two where he did not receive prompt treatment." In this regard, Redman joins the vast majority of Americans who suffer delays in care that, while unfortunate, are not the result of deliberate indifference. In sum, considering the totality of Redman's course of treatment, it is clear that he received constitutionally adequate care. *Dunigan*, 165 F.3d at 591. His deliberate indifference claim must, therefore, be dismissed.

Redman's other claim is for medical malpractice under Wisconsin state law. It is grounded on the same operative set of facts as his constitutional claim. This claim, however, is more easily disposed of, since Wisconsin law does not permit medical malpractice claims directly against nurses. *See Northern v. Frisk*, 13-cv-367-jdp, 2017 WL 2589426, at *1 (W.D. Wis. June 14, 2017); *Patients Comp. Fund v. Lutheran Hosp.-La Crosse, Inc.*, 573 N.W.2d 572, 575 (Wis. Ct. App. 1997). Instead, the patient must sue the nurse's employer, which Redman has not done.

Moreover, even if Redman had crossed this procedural hurdle, Wisconsin usually requires, as part of a *prima facie* medical malpractice case, that a plaintiff establish the standard of care through expert testimony. *Carney-Hayes v. N.W. Wis. Home Care, Inc.*, 699 N.W.2d 524, 537 (Wis. 2005). Redman has offered none. Nor has he proffered facts supporting the only alternative to expert testimony on the standard of care: namely, that the standard of care "[is] within the area of common knowledge and lay comprehension." *Olfe v. Gordon*, 286 N.W.2d 573, 576 (Wis. 1980). Nothing in the evidence reflects that the medical matters at issue would be part of

the "ordinary experience of mankind," *Cramer v. Theda Clark Mem'l Hosp.*, 172 N.W.2d 427, 429 (Wis. 1969), which normally includes things like "the removal of the wrong body part despite a correct preoperative diagnosis or leaving a surgical instrument in the patient," *Jeckell v. Burnside*, 786 N.W.2d 489, at *2 (Wis. Ct. App. 2010); *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004). Assessing the propriety of Defendants' actions with respect to Redman's foot care would "require special learning, study, or experience." *Cramer*, 172 N.W.2d at 429. As a result, Redman was required to secure expert testimony to explain these matters to the jury, but did not. This claim must also be dismissed.

### 4. CONCLUSION

Viewing the record evidence in the light most favorable to Redman, there is insufficient evidence to raise triable issues of fact as to either of his claims. The record and the relevant authorities oblige the Court to dismiss this case in its entirety.

Accordingly,

**IT IS ORDERED** that Defendant Lori Doehling's motion for summary judgment (Docket #27) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Christine Dietrich's motion to file her interim settlement report under seal (Docket #24) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Christine Dietrich's motion for summary judgment (Docket #34) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's fourth motion for appointment of counsel (Docket #44) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of December, 2017.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Court